IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CR-287-FL-3

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | ORDER |
| | ) | |
| KAWUAN J. ROBERTSON, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to suppress certain evidence allegedly obtained in violation of the Fourth Amendment to the United States Constitution. (DE 104). This matter also comes before the court on defendant's motion for probable cause hearing under Franks v. Delaware, 438 U.S. 154 (1978). (DE 105). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b), United States Magistrate Judge Robert T. Numbers, Jr., entered memorandum and recommendation ("M&R"), wherein it is recommended that defendant's motions be denied. (DE 125). Defendant timely objected to the M&R. In this posture, the issues raised are ripe for ruling. For the reasons that follow, defendant's motions are denied.

## STATEMENT OF THE CASE

On July 26, 2018, defendant was indicted for conspiracy to possess with intent to distribute 50 grams or more of a mixture containing a detectable amount of methamphetamine; a quantity of heroin; and a quantity of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

After several extensions of time and one substitution of defense counsel, defendant filed in the instant motion to suppress. Defendant argues that the officers in this case lacked reasonable suspicion to stop him, that the officers lacked probable cause to arrest him, and that all evidence

obtained as a result of his allegedly unlawful arrest should be suppressed as fruit of the poisonous tree. The government responded in opposition, arguing the court should reject each ground for suppression.

The same day defendant filed his motion to suppress, he also filed a motion for a Franks hearing to determine whether a search warrant for his apartment was supported by probable cause. Defendant asserts that the search warrant was materially false and misleading because the officer seeking the warrant did not discuss in his application other phone calls made during his time in jail, and wrongly asserted that, based on the officer's interpretation of defendant's calls, defendant's conduct in certain phone calls was persistent or urgent. In support of the motion, defendant relies upon transcripts of the four calls described by the officer in the search warrant. The government responded in opposition, relying upon the affidavit in support of the search warrant by officer Jamar Neal ("Neal") of the Irvington, New Jersey police department.

Evidentiary hearing was held before the magistrate judge on August 20, 2019. The court heard testimony from captain Kevin McGlockland ("McGlockland") of the Nash County Sheriff's Office ("NCSO"), and Jason Bryant ("Bryant"), who at times relevant to this litigation was a sergeant with the NCSO. On September 19, 2019, the magistrate judge issued M&R, finding that reasonable suspicion supported the officers' investigatory stop in this case, that probable cause supported defendant's arrest, and that defendant was not entitled to a Franks hearing. Defendant objected to each of the magistrate judge's findings.

### STATEMENT OF FACTS

A.  Investigatory Stop and Arrest

In or around Fall 2017, the Tar River Regional Drug Task Force investigated Cory Boose ("Boose") for distributing narcotics from his residence. (Transcript of Hearing ("Tr.") (DE 124)

2

28:7–14, 29:4–15). After observing cars arrive at the residence, stay for a brief period, then leave, the officers concluded based on their training and experience that Boose sold drugs in his home. (Tr. 29:21–30:2). Later, a confidential informant also informed officers that Boose obtained bricks of heroin from two suppliers in New Jersey known as "Doob" and "Fell." (Tr. 30:20–31:7). Investigators were able to identify and confirm with the confidential informant that Fell was co-defendant Shamsuddine Green. (Tr. 31:3–17).

Co-defendant Shamsuddine Green agreed to sell the confidential informant multiple bricks of heroin. (Tr. 32:9–11). He did not tell the confidential informant exactly when he was coming, but promised that he would come to Nashville, North Carolina. (Tr. 32:14–17). Law enforcement began tracking co-defendant Shamsuddine Green's cell phone location once co-defendant Shamsuddine Green agreed to sell heroine to the confidential informant. (Tr. 32:25–33:9, 34:17–22). After spending several days in New Jersey, the phone began moving south on November 11, 2017, indicating to officers that co-defendant Shamsuddine Green was travelling south to North Carolina. (Tr. 33:2–12). Several officers, including McGlockland, surveilled Interstate 95 in Virginia and North Carolina, anticipating that co-defendant Shamsuddine Green would travel there. (Tr. 33:13–18).

McGlockland received notice when co-defendant Shamsuddine Green passed cell phone towers. (Tr. 34:17–22). Because drug traffickers often use different cars to move narcotics, McGlockland looked out for co-defendant Shamsuddine Green's vehicle and other suspicious vehicles. (Tr. 34:1–16). Immediately after learning that co-defendant Shamsuddine Green's phone pinged at a tower past him on the highway, McGlockland got on Interstate 95 and began checking to see if any vehicles were suspicious. (Tr. 35:4–15). Eventually, McGlockland noticed a Ford Taurus with a New Jersey license plate, which another officer informed him was registered

to Tiffany Howard ("Howard"), an associate of co-defendant Shamsuddine Green. (Tr. 35:23–36:9). The Taurus got off Interstate 95 and headed toward 1381 East Old Spring Hope Road in Nashville. (Tr. 36:13–21). McGlockland and another officer, Captain Wilson, followed the Taurus until around 1:15 a.m., then initiated a traffic stop on Washington street in Nashville after observing traffic violations. (Tr. 36:22–37:16).

The occupants of the Taurus were Khadija Smith ("Smith"), the driver; co-defendant Michael Green, the passenger; and Smith's teenage daughter, sitting in the back of the car. (Tr. 38:1–9). Wilson asked Smith for her license and the vehicle's registration. (Tr. 38:14–18). Smith produced her license, while co-defendant Michael Green searched unsuccessfully for the registration. (Tr. 38:14–18). Co-defendant Michael Green told McGlockland that co-defendant Shamsuddine Green and Howard owned the Taurus. (Tr. 38:19–23). Immediately after that, without being asked, co-defendant Michael Green called someone on his cell phone, told the person he had been pulled over, and asked where he could find the car's registration. (Tr. 38:25–39:12). McGlockland asked co-defendant Michael Green who he called, and he responded with a name that sounded like "Quan." (M&R (DE 124) at 4 n.3; see Tr. 39:1–2). McGlockland knew that the car was not registered to someone by that name, giving him reason to believe co-defendant Michael Green was tipping the person on the phone off that they had been stopped. (Tr. 39:3–19).

During the traffic stop, McGlockland learned that co-defendant Shamsuddine Green's phone was not pinging from the location where the Taurus was stopped. (Tr. 40:15–21). McGlockland asked co-defendant Michael Green if he knew where co-defendant Shamsuddine Green was, and co-defendant Michael Green responded that he was in New Jersey. (Tr. 40:3–8). Co-defendant Michael Green also related that he was headed to meet his friend Cory at 1381 East Old Spring Hope Road. (Tr. 40:22–41:3; see Tr. 41:3–17). However, Smith told McGlockland

4

they were headed to an address in Nashville, known by co-defendant Michael Green, to meet co-defendant Shamsuddine Green. (Tr. 40:9–14). Based on this information, McGlockland believed that there was more than one vehicle involved in transporting heroin to North Carolina. (Tr. 41:18–21).

Within five to six minutes after the initial stop, a K-9 unit reported to the traffic stop. (Tr. 42:13–15). The K-9 alerted to the Taurus's passenger-side front door and the glove compartment. (Tr. 42:16–24). Almost immediately after the K-9 alert, Bryant told McGlockland that the confidential informant reported co-defendant Shamsuddine Green was at Boose's house. (Tr. 43:3–13, 58:19–24). Bryant and a few other officers left the traffic stop to go to Boose's residence. (Tr. 44:10–13). In the meantime, McGlockland searched around the dashboard in the glove box area of the vehicle, eventually noticing that a new welding had been placed underneath the dashboard. (Tr. 44:14–20). McGlockland determined this was consistent with installing a hidden compartment in the dashboard. (Tr. 44:19–20). Officer Phil Lewis ("Lewis"), who was assisting McGlockland, located a crack in the dashboard, through which the officers could see a brick wrapped up in magazine covers and newspaper along with individual baggies tied up with rubber bands. (Tr. 44:21–45:2, 51:2–13). The packaging was consistent with the way heroin was typically packaged. (Tr. 51:2–13). McGlockland immediately alerted Bryant that they had located what appeared to be narcotics in the vehicle. (Tr. 45:7–13).

At about 1:20 p.m., Bryant arrived at Boose's residence with five other officers. (Tr. 59:11–23). The house was completely dark and it appeared that no one was home. (Tr. 59:13–17). Once Bryant was about halfway down the driveway, he noticed a pewter-color Chrysler minivan with Pennsylvania tags. (Tr. 60:14–17). Bryant and the other officers approached the van, and saw three males inside of the vehicle. (Tr. 60:19–20). Bryant eventually learned that

defendant was in the driver's seat, Rachine Green was in the passenger seat, and co-defendant Shamsuddine Green was in the back of the car. (Tr. 60:21–61:4). The minivan was a rental car, which in Bryant's training and experience were commonly used by drug traffickers to transport drugs. (Tr. 62:17–24, 62:25–63:8). No one could produce a rental agreement for the minivan. (Tr. 65:1–3).

Bryant explained to the occupants he was conducting a narcotics investigation and asked them for their identification. (Tr. 64:9–21). By that time, Bryant knew that McGlockland had discovered what appeared to be contraband in the Taurus. (Tr. 64:22–25). No more than six minutes after approaching the vehicle, Bryant asked the occupants of the minivan to exit the vehicle. (Tr. 65:4–10, 65:20–23). Bryant explained that defendant, Rachine Green, and co-defendant Shamsuddine Green were going to be detained until they could figure out what was going on. (Tr. 67:9–16). The officers handcuffed the occupants and placed them at different locations near the vehicle. (Tr. 67:17–18).

After obtaining consent from defendant, Rachine Green, and co-defendant Shamsuddine Green, the officers searched the minivan. (Tr. 66:13–23). The officers found no luggage or toiletries even though the travelers had come to rural North Carolina from several states away. (Tr. 69:17–24). Co-defendant Shamsuddine Green told Bryant they were going to Durham to visit friends and relatives, while defendant and Rachine Green said they were going to Greensboro. (Tr. 69:22–70:7). Since no one could provide a rental agreement for the minivan, Bryant had the vehicle towed away. (Tr. 70:16–20). Bryant took the minivan's occupants to a warehouse where other officers had taken the Taurus driven by Smith and co-defendant Michael Green. (Tr. 72:14–22). At the warehouse, officers eventually found methamphetamine, heroin, and cocaine base in the Taurus's hidden compartment. (Tr. 73:1–22). Thereafter, defendant was formally arrested.

B.  Search Warrant for Defendant's Apartment

On November 18, 2017, Neal appeared in New Jersey state court to obtain a search warrant for defendant's apartment. (Neal Aff. (DE 114-1) at 7). The affidavit accompanying the warrant discussed the stop of the vehicles on November 12, 2017. (Neal Aff. (DE 114-1) at 2–3). Subsequent to his arrest, defendant placed several calls to Jashon Green, who allegedly had driven from New Jersey to North Carolina for the sole purpose of picking up defendant's keys and wallet from the county jail. (Neal Aff. (DE 114) at 3). Defendant told Jashon Green to go back to New Jersey, move defendant's car, and retrieve defendant's belongings from his apartment. (Neal Aff. (DE 114-1) at 3). Neal described defendant's phone calls with Jashon Green about removing his belongings as persistent and urgent. (Neal Aff. (DE 114-1) at 3).

Jashon Green visited defendant's apartment on November 15, 2017, at around 10:15 a.m. and was denied access by security personnel. (Neal Aff. (DE 114-1) at 3). However, a confidential source reported that Jashon Green was able to access defendant's vehicle and fill a duffel bag full of unknown contents. (Neal Aff. (DE 114-1) at 3). At around 12:27 p.m. the same day, Jashon Green explained to defendant on the phone that he had been denied access to the building and was angry that security had gotten a picture of his driver's license. (Neal Aff. (DE 114-1) at 4). Defendant attempted to speak with security over the phone to allow Jashon Green entry, but security advised that they needed paperwork from defendant's attorney to allow entry. (Neal Aff. (DE 114-1) at 4).

On November 17, 2017, Drug Enforcement Administration ("DEA") agents contacted the apartment complex's security staff and asked if there had been any additional attempts to gain entry to defendant's apartment. (Neal Aff. (DE 114-1) at 4). Security reported that defendant's attorneys had sent the complex a letter asking management to allow defendant's mother into his

7

apartment and remove his property, but no one had tried to gain entry as of that date. (Neal Aff. (DE 114-1) at 4). Finally, the affidavit recounts defendant's and Jashon Green's criminal histories. (Neal Aff. (DE 114-1) at 4–5).

Neal explains that, based on his training and experience, probable cause supported his determination that contraband would be located at the apartment because, among other things, 1) the information contained in the taped phone calls and the urgency behind them indicated defendant was seeking assistance to remove and possibly destroy evidence, 2) distributors of illegal substances will make every effort to destroy evidence of illegal substances if given sufficient warning, and 3) persons engaged in illegal distribution will allow a trusted relative or associate to have access to the contraband. (Neal Aff. (DE 114-1) at 5–6).

Based on the affidavit, the judge found probable cause to search defendant's apartment. (Search Warrant (DE 114-1) at 9–10). The search of the apartment revealed controlled substances hidden in defendant's couch. (Tr. 18:10–15; Mot. for Franks Hearing (DE 105) at 4).

Additional facts pertinent to the instant motions will be discussed below.

## DISCUSSION

A.  Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d

198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.  Analysis

   1.  Defendant's Motion to Suppress (DE 104)

Defendant challenges the constitutionality of the investigatory stop initiated by Bryant and the other officers on grounds that the officers lacked reasonable suspicion. Defendant also asserts that he was arrested from the moment he was ordered to leave the vehicle, and that in any event the government lacked probable cause to arrest him. The court addresses defendant's arguments in turn.

      a.  Investigatory Stop

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The authority and limits of the Amendment apply to investigative stops of vehicles such as occurred here." United States v. Sharpe, 470 U.S. 675, 682 (1985). To determine if an investigatory stop is constitutionally reasonable, the court considers "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).

"[A] law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty., 542 U.S. 177, 185 (2004); Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "[O]fficers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States

9

v. Cortez, 449 U.S. 411, 417–18 (1981). In assessing whether officers had reasonable suspicion, the court must consider the totality of the circumstances, with due weight given to common sense judgments made by officers in light of their training and experience. Wardlow, 528 U.S. at 125; United States v. Sokolow, 490 U.S. 1, 8 (1989).

"[T]he mere fact that particular conduct may be susceptible of an innocent explanation does not establish a lack of reasonable suspicion." United States v. Perkins, 363 F.3d 317, 327 (4th Cir. 2004). In Perkins, the United States Court of Appeals for the Fourth Circuit found reasonable suspicion where, in part, "[the officer] knew that it was a drug-ridden residential neighborhood, and that the duplex itself was a known drug house. He identified the passenger in the car as a known drug taker." Id. at 327–28; see also United States v. Stanfield, 109 F.3d 976, 985–86 (4th Cir. 1997) (finding reasonable suspicion where, among other things, defendant "was stopped in an area of the city known for its open drug trafficking, in a vehicle frequently associated with drug activity, and he was talking with a known drug dealer"). "[N]ervous, evasive behavior" and "no proof of authority to operate the vehicle" can support a finding of reasonable suspicion. United States v. Branch, 537 F.3d 328, 338 (4th Cir. 2008) (internal citations omitted). Moreover, evidence of a lead car-load car arrangement, where a shipment of contraband travels separately from the dealer, can give rise to reasonable suspicion of criminal activity. See, e.g., United States v. Villalobos, 161 F.3d 285, 290 (5th Cir. 1998); United States v. McMahon, 562 F.2d 1192, 1195 n.6 (10th Cir. 1977) (collecting cases); United States v. Vital-Padilla, 500 F.2d 641, 644 (9th Cir. 1974); cf. United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) (finding reasonable suspicion when a man walked away from a deserted area where a burglar alarm had just gone off).

In the instant case, officers were investigating co-defendant Shamsuddine Green for transporting multiple bricks of heroin to North Carolina. (See Tr. 32:25–33:9, 34:17–22). While

monitoring co-defendant Shamsuddine Green's cell phone as it traveled from New Jersey to North Carolina, officers identified and stopped a car registered to co-defendant Shamsuddine Green's associate, Howard. (Tr. 35:4–15, 35:23–36:9, 36:13–21, 36:22–37:16). A K-9 search resulted in a positive alert for drugs, and officers discovered a hidden compartment containing materials packaged in a manner consistent with drug trafficking. (Tr. 42:13–24, 44:14–45:13, 51:2–13).

However, co-defendant Shamsuddine Green was not in the car, his phone was not pinging from the location where the Taurus was stopped, and the occupants of the Taurus gave inconsistent explanations as to where co-defendant Shamsuddine Green was located. (Tr. 40:3–41:17). Without being asked, co-defendant Michael Green told someone with a name that sounded like "Quan" that he had been pulled over, and asked where he could find the car's registration. (Tr. 38:25–39:12; M&R (DE 124) at 4 n.3). However, the officers knew the car was registered to Howard, giving them reason to believe the call was to tip the person on the phone off that they had been stopped. (Tr. 39:3–19). Based on this information, officers believed based on their training and experience that there was more than one vehicle involved in transporting heroin to North Carolina, with co-defendant Shamsuddine Green riding in the minivan, while the Taurus served as the load car. (Tr. 41:18–21, 42:8–12, 62:10–16).

Considering the information above in conjunction with the totality of the circumstances, the government had sufficient objective, particularized suspicion to initiate an investigatory stop with defendant. Similar to Perkins and Stanfield, defendant was present at a known drug house late at night when nobody appeared to be home, and the government had compelling evidence that co-defendant Shamsuddine Green, one of the passengers in the car, was a drug dealer as well. (See Tr. 28:7–14, 29:4–15, 29:21–30:2, 30:20–31:17, 59:13–17, Tr. 60:21–61:4). Like Branch, there was no evidence that defendant had authority to operate the vehicle. (Tr. 62:17–24, 62:25–63:8,

11

65:1–3). Moreover, an officer could reasonably conclude that other individuals were conspiring with co-defendant Shamsuddine Green based on co-defendant Michael Green's statement that he told "Quan" he had been stopped. (Tr. 38:25–39:12; M&R (DE 124) at 4 n.3).

Defendant argues he was immediately arrested by the officers when law enforcement pulled in behind the minivan, because he was not free to leave the scene. (Pl. Obj. (DE 13) at 6). Defendant also argues that his arrest was continued from the moment he was removed from the vehicle and cuffed. (Pl. Obj. (DE 13) at 6). "The perception . . . that one is not free to leave is insufficient to convert a Terry stop into an arrest. A brief but complete restriction of liberty is valid under Terry." Moore, 817 F.2d at 1108. Indeed, "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest." United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007) (quoting United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995)); Moore, 817 F.2d at 1108 (collecting cases). However, the police may not "seek to verify their suspicions by means that approach the conditions of arrest." Fla. v. Royer, 460 U.S. 491, 499 (1983) (citing Dunaway v. New York, 442 U.S. 200, 216 (1979)). In Dunaway, the United States Supreme Court held the police violated the Fourth Amendment "when, without probable cause, they seized petitioner and transported him to the police station for interrogation." 442 U.S. at 216; see Kaupp v. Texas, 538 U.S. 626, 630 (2003).

The unrefuted testimony of Bryant is that defendant was asked to exit the vehicle and handcuffed for officer safety reasons. (See Tr. 67:8–16, 86:5–9). Patting down defendants was for officer safety. (Tr. 82:1–3). Executing a consent search of the vehicle did not elevate the investigatory stop to a custodial arrest. (Tr. 66:13–23). Consistent with Dunaway, the investigatory stop was elevated to a custodial arrest when Bryant and the other officers on scene

moved defendant to a warehouse where other officers had taken the Taurus driven by Smith and co-defendant Michael Green. (Tr. 72:14–22; see Tr. 86:13–19). Thus, the court addresses whether the government had probable cause to arrest defendant at the moment he was told that he was still detained and being transported to the warehouse.

      b.      Custodial Arrest

In effecting an arrest, probable cause exists when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); see Devenpeck v. Alford, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.") (citation omitted). Probable cause is determined based upon the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 233 (1983).

At the time defendant was arrested, the officers on scene had all the information known to them at the time they commenced their investigative stop. They also obtained further information from the consent search of the minivan relevant to the probable cause determination. First, despite being hundreds of miles from home, the minivan contained no luggage or toiletries, which based on the officers' training and experience was consistent with drug trafficking. (Tr. 69:17–24, 70:8–15). Second, defendant and the other occupants of the car gave inconsistent explanations as to where they were going. (Tr. 69:24–70:6). On de novo review, the court holds a reasonable person could conclude defendant was the driver of a lead car traveling together with the Taurus for purposes of selling controlled substances.

13

Defendant argues that the evidence presented in this case establishes probable cause to arrest co-defendant Shamsuddine Green, but defendant contends that it is insufficient to connect him to any conspiracy. (Pl. Obj. (DE 130) at 7). Defendant's argument is unpersuasive. See United States v. Mendoza, 226 F.3d 340, 344–45 (5th Cir. 2000). Accordingly, defendant's motion to suppress is denied.

2. Defendant's Motion for Franks Hearing (DE 105)

Defendant asserts that the warrant issued by the New Jersey state court authorizing search of his apartment was supported by material false statements and omissions intentionally made by the affiant. "An accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." United States v. Allen, 631 F.3d 164, 171 (4th Cir. 2011). However, the Fourth Amendment requires a hearing on the validity of a warrant "[w]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155–56 (1978).

A showing of falsity "'must be more than conclusory' and should include affidavits or other evidence to overcome the 'presumption of [the warrant's] validity.'" United States v. Clenney, 631 F.3d 658, 663 (4th Cir. 2011) (quoting Franks, 438 U.S. at 171). "[T]he defendant cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts. Rather, there must be evidence showing that the statements at issue are objectively false." United States v. Moody, 931 F.3d 366, 370–71 (4th Cir. 2019).

"[T]he defendant must [also] provide facts—not mere conclusory allegations—indicating that the officer subjectively acted with intent to mislead, or with reckless disregard for whether the

14

statements would mislead, the magistrate. Id. (citing United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990)). "Allegations of negligence or innocent mistake are insufficient." Herring v. United States, 555 U.S. 135, 145 (2009) (quoting Franks, 438 U.S. at 171); United States v. Lull, 824 F.3d 109, 115 (4th Cir. 2016) (internal citations omitted).

Finally, the defendant must establish that the false statement or omission was material, meaning that its inclusion or exclusion is "necessary to the finding of probable cause." Moody, 931 F.3d at 371 (internal citations omitted); United States v. Wharton, 840 F.3d 163, 168 (4th Cir. 2016). "To determine materiality, a court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause.'" Miller v. Prince George's Cty., MD, 475 F.3d 621, 628 (4th Cir. 2007) (quoting Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000)). "The burden of making the necessary showing" to be entitled to a Franks hearing "is thus a heavy one to bear." United States v. Tate, 524 F.3d 449, 454 (4th Cir. 2008).

The crux of defendant's argument for a Franks hearing is that, had Neal included information about other phone calls defendant made in jail to his mother to retrieve his belongings, there would be no probable cause for the assertion that he was seeking to destroy or remove evidence. (Mot. for Franks Hearing (DE 105) at 8). To begin with, defendant offers no evidence in support of his motion except the phone calls between him and Jashon Green, leaving the court to speculate as to whether he is entitled to a hearing. This alone is sufficient to defeat defendant's motion. Moody, 931 F.3d at 370–71.

Defendant argues that he should not be required to produce evidence because the recordings of his phone calls were within the sole possession of the government, and he cannot make the necessary showing required by the Fourth Circuit unless a Franks hearing is ordered.

15

(See Tr. 11:8–12:6; Pl. Obj. (DE 130) at 8). The court rejects this argument for two reasons. First, Moody requires that defendant, not the government, come forward with the evidence necessary to obtain a Franks hearing. The court declines to shift the burden in contravention of controlling law. Second, defendant's argument that the contents of his calls are solely in possession of the government is simply inaccurate. Defendant has independent recollection of who he called, and the individuals he called (such as his mother) could speak to the contents of those conversations. Therefore, defendant fails to appropriately support his motion with evidence.

Even assuming defendant could produce evidence that he did ask his mother to retrieve his personal belongings, such information would not render Neal's statements false, and the information would be immaterial in light of the facts already presented in the affidavit. Neal's affidavit recount the facts and circumstances discussed above, which indicate defendant was involved in drug trafficking. (Neal Aff. (DE 114-1) at 2–3). Further supporting the officer's affidavit is the fact that Jashon Green traveled all the way to North Carolina from New Jersey to retrieve defendant's keys and wallet. (Neal Aff. (DE 114-1) at 3). Jashon Green took items out of defendant's car, but did not move the car itself. (Neal Aff. (DE 114-1) at 3). At defendant's direction, Jashon Green made multiple attempts to access his apartment, and was "angry" that apartment security staff took a picture of his driver's license. (Neal Aff. (DE 114-1) at 3–4). Such facts appear inconsistent with defendant's argument that he was attempting to protect his property.

In addition, the judge issuing the warrant already knew that defendant, through his attorney, had asked the apartment complex to allow defendant's mother to enter and remove his belongings. (Neal Aff. (DE 114-1) at 4). The officer opined that based on his training and experience, drug traffickers allow close relatives or friends access to controlled substances. (Neal Aff. (DE 114-1) at 6). The fact that defendant may also have recruited his mother in addition to Jashon Green to

16

retrieve his belongings does not render Neal's statements false or materially affect the New Jersey court's probable cause determination.[1] Accordingly, defendant's motion for Franks hearing is denied.

## CONCLUSION

Based on the foregoing, defendant's motion to suppress (DE 104) is DENIED. Defendant's motion for Franks hearing (DE 105) is DENIED. An order scheduling arraignment will follow.

SO ORDERED, this the 2nd day of December, 2019.

LOUISE W. FLANAGAN
United States District Judge

---

[1] Defendant also fails to produce any evidence that Neal's omission of defendant's phone calls was intentional.